# Order

June 23, 2010

140409

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

JAMES S. BRADY, JON R. MUTH,
BRUCE W. NECKERS, MICHAEL A.
WALTON, ROBERT J. DUGAN,
L. ROLAND ROEGGE, WILLIAM
W. JACK, JR., H. RHETT PINSKY,
JOHN D. TULLY, JOSEPH M.
SWEENEY, PAUL T. SORENSEN,
FREDERICK D. DILLEY, JANET
A. HAYNES, DENNIS C. KOLENDA,
ROBERT L. LALLEY, JR., WILLIAM
S. FARR, and DIANN J. LANDERS,
        Plaintiffs,

v

ATTORNEY GRIEVANCE COMMISSION,
        Defendant.

SC: 140409
AGC: 2075/08

_____/

On order of the Court, the complaint for superintending control is considered, and relief is DENIED, because the Court is not persuaded that it should grant the requested relief.

HATHAWAY, J. (*dissenting*).

I would grant the complaint for superintending control and, in lieu of granting the requested relief, I would direct the Attorney Grievance Commission to vacate its dismissal of the request for investigation, and to appoint independent legal counsel to review and investigate the allegations of misconduct against the respondent attorney that are contained in the request for investigation. I would further direct the appointed counsel to present findings and conclusions to the Attorney Grievance Commission, which should then reconsider its decision whether to file a formal disciplinary complaint against the respondent attorney with the Attorney Discipline Board.

WEAVER, J., not participating.

I am not participating in this complaint for superintending control because the circumstances that I describe below could have raised an appearance of impropriety had I participated in the case.[1] I informed the parties in this case of my disqualification in a letter dated April 20, 2010.[2] (A copy of my letter to the parties is attached.) As the circumstances described in the letter establish, I have done nothing wrong and nothing unethical. Nevertheless, I followed my long-standing practice for disqualification that "when in doubt, get out."

This complaint for superintending control, filed January 2010, arose from the Attorney Grievance Commission's (AGC) dismissal on November 17, 2009 of the plaintiffs' June 27, 2008 request for investigation of alleged attorney misconduct by Paul J. Fischer, Executive Director and General Counsel of the Judicial Tenure Commission (JTC), in the disciplinary proceeding against Judge Steven Servaas. The disciplinary proceeding against Judge Servaas was reviewed and ruled upon by this Court in *In re Servaas*, 484 Mich 634 (2009).

In *In re Servaas*, attorney Jon Muth represented Judge Servaas. This Court's decision and opinions in *In re Servaas* were published for the public on July 31, 2009. On August 24, 2009 the JTC filed a motion for rehearing or clarification in this Court. On September 11, 2009 this Court issued an order denying a motion for rehearing and containing an additional statement by Chief Justice Kelly, which clarified by amendment her original opinion. Therefore, this Court's file in *In re Servaas* closed on September 11, 2009.

---

[1] This Court recently amended MCR 2.003—Disqualification of Judge to include an appearance of impropriety standard as a ground for disqualification of judges. The newly amended rule set forth in MCR 2.003(C)(1)(b) states: "The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as annunciated in *Caperton v A T Massey Coal Co, Inc*, 556 US ___; 129 S Ct 2252, 2255; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct."

The test for determining whether an appearance of impropriety exists, as laid out in *Caperton v Massey*, is "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired."

[2] Plaintiffs Brady *et al.* consist of: James S. Brady, Jon R. Muth, Bruce W. Neckers, Michael A. Walton, Robert J. Dugan, L. Roland Roegge, William W. Jack Jr., H. Rhett Pinsky, John D. Tulley, Joseph M. Sweeney, Paul T. Sorensen, Frederick D. Dilley, Janet A. Haynes, Dennis C. Kolenda, Robert L. Lalley Jr., William S. Farr, and Diann J. Landers. The defendant is the Attorney Grievance Commission.

In mid-September 2009, I briefly encountered my friend and former attorney, Mr. Muth, at the State Bar of Michigan Fellows reception in Dearborn. Given that the file in *In re Servaas* had already been closed, Mr. Muth and I agreed to meet in Traverse City for a visit over lunch when he would be passing through town on October 1, 2009. At the time that we agreed to meet, and up until the time I received this Court's Commissioner Report in late March 2010, I had no reason to recall that at the March 4, 2009 *In re Servaas* oral argument, Mr. Fischer stated that "Judge Servaas had his attorneys and a number of others file a grievance against me with the Attorney Grievance Commission." Mr. Fischer made this statement in response to questions about whether the JTC had authorized or encouraged him to proceed in the manner that he did while handling the *Servaas* matter and making an unannounced visit to confront Judge Servaas in his chambers.[3]

I had no reason to realize that a file for a grievance against Mr. Fischer may have been opened and an investigation of his conduct may have been ongoing. Under MCR 9.126, such files are sealed.[4] I had no official notice of any file's existence, and I had no notice of any file's status.

Mr. Muth and I did meet on October 1, 2009 for lunch in Traverse City. He indicated that he found this Court's result in *In re Servaas* strange, convoluted, and surprisingly close after what he had witnessed during the oral argument.[5] I responded

---

[3] The record in *In re Servaas* contains an audio recording of Mr. Fischer's unannounced visit to Judge Servaas's chambers on January 16, 2008 and his threat to "drag [Judge Servaas's] name through the mud" unless he agreed to resign by 9:00 a.m. the following morning. The recording was made, apparently without the knowledge of Mr. Fischer or Judge Servaas, by the State Police Trooper accompanying Mr. Fischer on the unannounced visit to Judge Servaas's chambers. The recording was also made public in the media, and is available online at http://blog.mlive.com/grpress/2008/04/_by_john_tunison_the.html (last accessed June 18, 2010).

[4] MCR 9.126—Open Hearings; Confidential Files and Records, provides in pertinent part:

(A) Investigations. Except as provided in these rules, investigations by the administrator or the staff may not be made public. At the respondent's option, final disposition of a request for investigation not resulting in formal charges may be made public.

that his observation was correct and that the vote was originally 6-1 in Judge Servaas's favor. I told him my speculation was that the emphasis and the direction of some justices' positions perhaps shifted with recognition that the State Court Administrative Office (SCAO) may have had more involvement in the *Servaas* matter than merely referring such allegations to the JTC for investigation and process according to JTC rules.

I reminded Mr. Muth that in my concurrence in *In re Servaas*,[6] I called for an investigation of the JTC and any others possibly involved, but that no such investigation had occurred. Instead, this Court published six (6) separate opinions,[7] resulting in the convoluted decision that prompted a motion for rehearing or clarification by the JTC, required an amendment for clarification to one justice's opinion, and led to Mr. Muth's questions. Mr. Muth and I did not discuss or mention any request for an AGC investigation of Mr. Fischer or the possibility of a complaint for superintending control, which is the underlying issue of the instant complaint. We did not discuss any possible allegations of misconduct by Mr. Fischer, or the instant complaint, in any way.[8]

Although Mr. Muth was my attorney at one point in time, he was not my attorney at any time while *In re Servaas* was pending, nor when we met in October 2009. To clarify, Mr. Muth is not currently my attorney, and I have not discussed the instant complaint with him, nor have I had any communication with him since I learned in late March 2010 that the instant complaint had been filed in this Court.[9] The instant complaint, while related to the *Servaas* matter, is a separate and distinct case.

---

[5] See the video of that March 4, 2009 oral argument, soon to be placed on my personally-funded website: www.justiceweaver.com.

[6] In my concurring opinion in *In re Servaas*, I urged this Court to "open an administrative file to investigate how this matter unfolded, including the events and actions of the Judicial Tenure Commission (JTC) and/or others responsible leading up to the JTC's recommendation of this case to this Court." 484 Mich at 654 (Weaver, J., *concurring*). I note that Justice Hathaway signed both my concurring opinion and my lead opinion.

[7] See *In re Servaas,* 484 Mich 634 (2009). The opinion and order will also be at my personally-funded website: www.justiceweaver.com.

[8] At that time, October 1, 2009, the instant complaint did not exist. The AGC did not even dismiss the referral until November 17, 2009. Therefore, I could not possibly have given Mr. Muth any advice regarding the instant complaint for superintending control when the grounds for this complaint did not even exist.

[9] I was notified of the instant complaint by Chief Justice Kelly and by the Commissioner's Report that was prepared for this case. Contrary to the reports in Lawyers Weekly, as cited by Justices Corrigan, Young, and Markman, I have never

Had I realized that any grievance filed against Mr. Fischer by Mr. Muth could be pending with the AGC, I would not have met with Mr. Muth. Therefore, while there was nothing unethical about my conversation with Mr. Muth, I informed the parties that I must disqualify myself from participating in the instant complaint for superintending control because of the appearance of bias or impropriety that my meeting with Mr. Muth may have presented.

On April 20, 2010, I sent my disqualification letter to the parties in this case, and requested that the parties reply at their earliest convenience, but no later than 28 days from receipt of my letter.

By letter dated April 30, 2010, I received notice from attorney-plaintiff Dennis Kolenda on behalf of the plaintiffs that the 17 plaintiffs waived my disqualification. In his letter, Mr. Kolenda stated "[t]here is...no basis for any objection to Justice Weaver's continued participation." In addition, by letter dated April 30, from attorney-plaintiff Jon Muth, Mr. Muth stated that there is no basis for my disqualification.[10] Mr. Muth explained that his letter "states the facts of [his] communication with Justice Weaver and establishes categorically that there was no violation of any of the Canons or Rules of Professional Conduct...." He additionally explained "that these facts also clearly establish that there is no basis [for] Justice Weaver to consider disqualification, even under an appearance of impropriety standard." Having received no response to my disqualification statement from the AGC, I did not participate in this complaint for superintending control.[11]

At the May 12, 2010 public administrative conference, Justices Corrigan, Young and Markman admitted publicly that on April 28, 2010, they had referred me to the JTC regarding this case.[12] Justices Corrigan, Young and Markman sent the JTC a copy of my April 20, 2010 disqualification statement and one page of a hearsay memorandum report by an AGC investigator, which is contained in the AGC's sealed file in this *Brady v AGC* case. Justices Corrigan, Young, and Markman state that I have intentionally left this

---

suggested that I was the one to notify this Court about my meeting with Mr. Muth. In fact, I had no knowledge that my meeting with Mr. Muth had any relevance to the instant complaint until I read this Court's Commissioner's Report.

[10] Attached are copies of the April 30, 2010 letters from Mr. Kolenda and Mr. Muth.

[11] Based on the responses from Mr. Muth and Mr. Kolenda, I would have withdrawn my disqualification if the AGC had also sent a similar response.

[12] I leave Justices Corrigan, Young and Markman to their own concerns about violating MCR 9.221(C) by speaking publicly about their referral of me to the JTC.

document out of my statement. However, the reason that I have not attached this document to my statement is because it is contained within a sealed file. By the majority order today, that AGC file remains sealed.[13]

I can only assume that the hearsay memorandum report by an AGC investigator is the "revealing document" referred to by Justices Corrigan, Young, and Markman in their statement attached to this Order. Given that Justices Corrigan, Young, and Markman cast 3 of the 5 votes to deny relief on the complaint for superintending control and effectively keep the AGC file sealed,[14] it is ironic and disingenuous that they complain that I have not supplied a document that is contained within that sealed file. My colleagues were, and still are, free to vote to unseal this file.

And contrary to Justices Corrigan, Young and Markman's assertion that they merely brought this matter to the attention of the JTC and the AGC and will leave it to those agencies for judgment, Justices Corrigan, Young and Markman not only publicly accused me, but judged me as guilty. The judgments of Justices Corrigan, Young and Markman are apparent when viewing this Court's May 12, 2010 public administrative conference. Their judgments clearly go beyond "bringing this matter to the attention" of the JTC and the AGC. To view the May 12, 2010 public administrative conference, please see my personally-funded website: www.justiceweaver.com.[15]

---

[13] Also contained within the AGC's sealed file is information not sent to the JTC, containing statements obtained in the AGC investigation which, if true, show that the SCAO was involved in an investigation of the complaint against Judge Servaas. In response to Justices Corrigan, Young, and Markman's statement urging me to waive my right to confidentiality and privilege regarding their JTC referral of me under MCR 9.221(C), I recommend that Justices Corrigan, Young and Markman join me in voting to unseal all the files in *In re Servaas*. Waiver has little if anything to do with transparency.

I further recommend that this Court vote to unseal all the AGC files concerning the referral of Mr. Fischer underlying the instant complaint in *Brady v AGC*, pursuant to MCR 9.122(D). For complete transparency, *all* parts of these matters should be opened to the public, not just one part at the request of Justices Corrigan, Young, and Markman.

[14] The vote to deny relief on the complaint for superintending control and effectively keep the AGC file sealed was 5 to 1, with Justice Hathaway as the lone vote to grant superintending control. Given that I am not participating in this matter, I did not vote.

[15] In addition, attached is a June 8, 2010, letter from Mr. Muth to the Court in which he brought to the Court's attention certain inaccurate information that had been reported in the press and attributed to statements made by members of this Court at the May 12, 2010 public administrative conference and thereafter.

As the attached correspondence shows, I did not violate any ethical rules or do anything warranting JTC consideration by discussing *In re Servaas* with Mr. Muth after that case was *closed*. The only possible "rule" I could have violated was the "Gag Order," AO 2006-8,[16] which I believe is unconstitutional[17] because the "Gag Order" improperly prohibits speech about a case even after the case is closed. The "Gag Order" is in violation of both the Michigan Constitution and Canon 3A(6) of the Code of Judicial Conduct;[18] and the "Gag Order" is an attempt to forever prevent a justice (in this case me) from performing the justice's duty to inform the public about what the justice believes the public needs to know—no more, no less—regarding how this Court conducts the people's judicial business. There is no basis for referring a justice to the JTC for not following a rule that the justice believes is unconstitutional.

I note that Justices Corrigan and Young have also chosen not to abide by a rule – the disqualification rule – adopted by this Court because they believe it is unconstitutional. They expressed their positions on this Court's disqualification rule,

---

[16] AO 2006-8 states:

All correspondence, memoranda and discussions regarding cases or controversies are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical, improper or criminal conduct to the JTC or proper authority.

[17] Const 1963, art 6, § 6 requires that:

Decisions of the Supreme Court, including all decisions on prerogative writs, **shall be in writing** and shall contain a concise statement of the facts and **reasons for each decision** and reasons for each denial of leave to appeal. **When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.** [Emphasis added.]

[18] Canon 3A(6) provides:

A judge should **abstain** from public comment about a **pending or impending** proceeding in any court, and should require similar abstention on the part of court personnel subject to the judge's direction and control. This subsection **does not prohibit** a judge from making public statements in the course of official duties or from **explaining** for public information the procedures of the court or the judge's holdings or actions. [Emphasis added.]

MCR 2.003, in *Pellegrino v Ampco*, 485 Mich 1134, 1150 (2010), where Justice Corrigan stated: "I do not participate in the majority's decisions under the unconstitutional new version of MCR 2.003," and Justice Young stated: "As I have previously stated, MCR 2.003 as amended is unconstitutional."[19] 485 Mich at 1155.

I make no criticism or objection to Justices Corrigan and Young's choice to not apply and participate in this Court's disqualification rule because they believe the rule is "unconstitutional."

However, Justices Corrigan and Young's approach as to the disqualification rule as applied to themselves is quite in contrast and inconsistent with their condemnation of my position that the "Gag Order," AO 2006-8, is unconstitutional, and it is in conflict with and in violation of Canon 3A(6) of the Code of Judicial Conduct and forever prohibits a justice from performing the justice's duty to report to the public what the justice believes the public needs to know—no more, no less—about how the justices conduct the public's business.

As these facts illustrate, I have done nothing unethical, and the actions of Justices Corrigan, Young, and Markman amount to nothing more than political maneuvering in this Supreme Court Justice election year. (See my attached May 13, 2010 press release, documenting Justice Young's objection to my serving on this Court.)

Once again, Justices Corrigan, Young, and Markman are attempting to confuse the public by distracting attention from the true reason for my non-participation. I spoke with an attorney regarding a *closed* case. Our conversation was limited to that *closed* case, and we did not discuss the subject of the attorney grievance referral that arose from that *closed* case. Nevertheless, I recused myself from participation in this Court's review of the attorney grievance referral that arose from that *closed* case because these circumstances could have raised an appearance of impropriety had I participated. As this statement and its attachments show, I did not provide any information to a party which could give that party a "strategic advantage" in the attorney grievance referral that arose from that *closed* case.

In their statement to this order, Justices Corrigan, Young, and Markman continue to misstate the facts surrounding this matter. While they are entitled to their opinions, their opinions are incorrect and based on their continued misstatement of facts and vague, inaccurate allegations. Justices Corrigan, Young, and Markman assert that I provided

---

[19] In his dissent to the order amending MCR 2.003, Justice Young stated: "I respectfully dissent from the new majority's enactment of this unconstitutional rule of disqualification." 485 Mich at 1190.

information to a party that could be used as a "strategic advantage" in a related case, however, they fail to explain what this "information" is.

Regardless of Justices Corrigan, Young, and Markman's repeated vague, inaccurate assertions, the fact remains that the subject of the instant complaint for superintending control is *not* dependent on the resolution of the closed *In re Servaas* case. As both Mr. Muth and I have stated, we did not discuss Mr. Fischer or his conduct relevant to the *Servaas* matter. The public can obtain any information regarding my colleagues' views or opinions with respect to Mr. Fischer's handling of the *Servaas* matter simply by viewing this Court's oral argument in that case and by reading the opinions issued in *In re Servaas*. Nothing about the conversation I had with Mr. Muth can be considered "secret" information that could be used for a "strategic advantage" in the instant complaint for superintending control. If my colleagues have additional hearsay information that they wish to be made public, they should have voted to take superintending control and to open *all* files relevant to this matter.

As of today, June 22, 2010, the JTC has not contacted me about the referral and has taken no public action. Although I did nothing unethical in discussing a *closed* case, and I believe that this Court's forever-binding "Gag Order" is unconstitutional and violates the Code of Judicial Conduct, I did not participate in the instant complaint for superintending control because at the time I became aware that the instant complaint existed, I believed my meeting with Mr. Muth might cause a reasonable person to think that I would not be impartial if I were to participate in this complaint.[20]

---

[20] My meeting with Mr. Muth took place before this Court amended MCR 2.003 to include an appearance of impropriety standard. The first opportunity for this Court to apply the newly amended MCR 2.003 was in *Pellegrino v Ampco Systems Parking*, Docket No. 137111, when the plaintiff in that case filed a motion for disqualification of Justice Markman based on campaign statements Justice Markman had made about the plaintiff's attorney nine years prior to this Court amending the rule to include the appearance of impropriety standard. When reviewing and deciding the disqualification motion filed against Justice Markman, I stated that I "will not apply the appearance-of-impropriety standard retroactively to statements made by a justice concerning a party or a party's attorney prior to the rule's amendment." *Id.* While I stated in *Pellegrino* that I would not apply the appearance of impropriety standard retroactively to other members of this Court, in this matter I applied the standard retroactively to myself because since 2003 I have been calling for this Court to establish clear, written, and fair rules for disqualification and have been addressing the issue of my participation when necessary, as I did in *In re JK*, 468 Mich 202; 661 NW2d 216 (2003), *Gilbert v Daimler Chrysler*, 469 Mich 883; 669 NW2d 265 (2003), *Henry v Dow Chem Co*, 484 Mich 483; 772 NW2d 301 (2009), *In re Servaas*, 484 Mich 634; 774 NW2d 46 (2009), and *Kyser v Kasson Twp*, 483 Mich 903; 761 NW2d 692 (2009).

Justices Corrigan, Young, and Markman have repeatedly taken issue with my stated desire to keep the proceedings of this Court open and transparent. Transparency is not a new issue, nor is it limited to the Supreme Court. In fact, transparency has been a prominent issue in almost every representative government throughout the ages.

As Edmund Burke, a noted 18th Century statesman and philosopher, wrote:

> In all justice, as in all government, the best and surest test of excellence, is the publicity of its administration; for, whenever there is secrecy, there is implied injustice.

With regard to "secrecy," Lord Acton said:

> Everything secret degenerates, even the administration of justice; nothing is safe that does not show how it can bear discussion and publicity.

In addition, President John F. Kennedy stated:

> The very word "secrecy" is repugnant in a free and open society; and we are as a people inherently and historically opposed to secret societies, to secret oaths, and to secret proceedings. We decided long ago that the dangers of excessive and unwarranted concealment of pertinent facts far outweighed the dangers which are cited to justify it.

On the issue of "secrecy," I stand by Edmund Burke, Lord Acton, and President Kennedy. A justice's duty to inform the public about what the justice believes the public needs to know—no more, no less—regarding how this Court conducts the people's judicial business is more important than some judges' desire to make the judiciary a "secret club."

The Michigan Supreme Court should not be a "secret club." When elected twice by the people, I did not join one.

CORRIGAN, YOUNG, and MARKMAN, JJ. Justice WEAVER could simply have chosen to explain why she is not participating in this case. That is the only issue that she now needs to address. Instead, she argues once more that she has done nothing improper. We fulfilled our ethical duties by bringing her conduct to the attention of the Judicial Tenure Commission (JTC) and the Attorney Grievance Commission (AGC), and we leave it to them to determine whether there has been any misconduct. In view of Justice WEAVER's many public statements on this matter, we emphasize the following points:

(1) Everyone understands that a judge should not secretly help one side in a lawsuit. That is what Justice WEAVER appears to have done. She has apparently given valuable insider Court information to one party, information that the party could use to strategic advantage in a related case. She did not share this information with the public or the media; she secretly gave it only to one side.

(2) Our ethical responsibilities required us to refer Justice WEAVER's conduct to the JTC and the AGC. No rule precludes a complainant from disclosing to the public that an allegation of judicial misconduct has been brought to the attention of the JTC or the AGC. Moreover, our disclosure at a public administrative conference of Justice WEAVER's referral came in direct response to her attempt at this same conference, without any disclosure to the public, to retroactively eliminate a court rule that served as a legal basis for her referral. Five justices joined in rejecting this attempt.

(3) Justice WEAVER's claim, reflected in media reports, that *she* initiated disclosure of her secret conversation is false. Her conduct came to the Court's attention on March 25, 2010, and Justice WEAVER only provided a statement attempting to justify her conduct on April 20, 2010.

(4) Justice WEAVER's statement fails to disclose the full content of her secret conversation. She leaves out critical information that she shared with one side that possessed strategic value in a related case. A confidential document that contains this information, and that brought Justice WEAVER's conduct to our attention, has been turned over to the proper authorities. The confidential documents that Justice WEAVER has attached to her statement are by no means the only pertinent documents in her possession.

(5) We have urged Justice WEAVER in public sessions of the Court to waive her right of confidentiality under MCR 9.221(C)(1) so that the public can assess the evidence and judge the merits of our referral. Justice WEAVER has thus far refused to do so. We remain prepared to waive any right to confidentiality available to us under MCR 9.221(C)(2), and urge Justice WEAVER to do the same.

(6) Justice WEAVER attempts to distract attention from her refusal to release these documents by arguing for the release of *other* court files in *In re Servaas* and *Brady v AGC*. Given that a formal complaint was filed, and a published opinion issued, in *Servaas,* that case is already "unsealed," and in *Brady*, it is up to the respondent in that case, not any justice, to determine whether it can be "unsealed." See MCR 9.126(A).

(7) Justice WEAVER has maintained for years that she is not bound to honor the confidentiality of our deliberations, unlike every other justice that has served on this Court throughout its history. It is easy for an individual to provide a skewed and inaccurate account of the facts when that individual understands that others feel bound, and will abide, by rules of confidentiality, while that individual will not. It is also easy

under these circumstances for that individual to raise a host of distracting and irrelevant arguments that have nothing to do with the merits of the case, and to selectively include and exclude confidential documents, as she does here.

(8) Justice WEAVER's statement that our referral of her constitutes mere "political maneuvering" disregards that judges have an ethical obligation to refer apparently serious judicial misconduct to the proper authorities. Code of Judicial Conduct, Canon 3(B)(3). This is necessary in order to uphold the integrity of this Court so that it can fairly and responsibly serve the people of Michigan. Once the facts in this case become public, the people can reach their own conclusions as to whether this referral constitutes "political maneuvering."

(9) The tonnage of documents supplied by Justice WEAVER to accompany her statement should not obscure the simple fact that the single most revealing document of all—that describing the specific conduct by Justice WEAVER that serves as the basis for our referral—has not been supplied.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 23, 2010

Clerk

p0622

MEMORANDUM

TO:       Corbin Davis, Clerk of Court
          cc: The Justices and Mike Schmedlen

FROM:     Justice Elizabeth A. Weaver

DATE:     April 20, 2010

RE:       Disclosure statement in *Brady et al. v Attorney Grievance Commission*, #140409 █████ – Complaint for Superintending Control

---

I request the Clerk of the Court, Corbin Davis, to promptly transmit the following statement to the parties (Brady *et al.* and the Attorney Grievance Commission) in this complaint, and that in the interest of moving this case along, the parties indicate to this Court whether they will exercise their right of waiver at their earliest convenience, but no later than 28 days from receipt of this statement. I also request the Clerk to please inform me as soon as he has transmitted this statement to the parties:

In this statement of disclosure to the parties involved in *Brady et al.*[1] *v*

*Attorney Grievance Commission*, Docket No. 140409, I hereby raise the issue of

---

[1] Plaintiffs Brady *et al.* consist of: James S. Brady, Jon R. Muth, Bruce W. Neckers, Michael A. Walton, Robert J. Dugan, L. Roland Roegge, William W. Jack Jr., H. Rhett Pinsky, John D. Tulley, Joseph M. Sweeney, Paul T. Sorensen, Frederick D. Dilley, Janet A. Haynes, Dennis C. Kolenda, Robert L. Lalley Jr., William S. Farr, and Diann J. Landers. This complaint for superintending control was filed by a group of Grand Rapids attorneys, including two former State Bar presidents and two former judges. One of the former State Bar presidents is Jon Muth, who was the attorney for 63rd District Court Judge Steven Servaas in *In re Servaas*, ___ Mich ___; 774 NW2d 46 (2009).

1

disqualification with regard to my participation[2] in this complaint for superintending control for the reasons disclosed below.

This complaint for superintending control, filed January 2010, arises from the Attorney Grievance Commission's (AGC) dismissal on November 17, 2009 of the plaintiffs' June 27, 2008 request for investigation of alleged attorney misconduct by Paul J. Fischer, Executive Director and General Counsel of the Judicial Tenure Commission (JTC), in the disciplinary proceeding against Judge Steven Servaas.[3] The disciplinary proceeding against Judge Servaas was reviewed and ruled upon by this Court in *In re Servaas* pursuant to the procedures set forth in Article 6, section 30 of the Michigan Constitution and the rules set forth by this Court in MCR 9.200, *et seq.*

I do not have actual bias or prejudice for or against any party involved in this complaint or Mr. Fischer. In fact, I personally know and like Mr. Fischer. I also personally know and like Jon Muth, a plaintiff in this complaint and my former attorney. In *In re Servaas*, Mr. Muth represented Judge Servaas, and I

---

[2] I raise the issue of disqualification pursuant to the newly amended MCR 2.003(B), which provides that "[a] party may raise the issue of a judge's disqualification by motion or the judge may raise it."

[3] On January 20, 2010, the plaintiffs brought this complaint for superintending control pursuant to MCR 9.122(A)(2), which provides in pertinent part that "a party aggrieved by the dismissal may file a complaint in the Supreme Court."

2

disclosed his earlier representation of me to the parties in that case.[4]  I now write

to provide the parties in the instant complaint with the same disclosure.[5]

---

[4] Please see the attached documents.

[5] When the *Servaas* matter initially came before this Court, I advised the parties by memo on January 23, 2008 as follows:

> Attorney Jon Muth has represented me within the past year, for instance, as my attorney during the public hearing concerning the majority of four's adoption of the "Gag Order," Administrative Order No. 2006-08 [See Administrative Order No. 2006-8 (AO 2006-8), including my dissent, attached hereto].

I note the fact that AO 2006-8, the "Gag Order," was immediately adopted on an emergency basis by a 4-3 vote in a secret executive session on December 6, 2006.  The secret executive session excluded all Court staff and the "Gag Order" was adopted at that session without notice to the public and in fact without prior notice to some of the justices. The "Gag Order" was never retained pursuant to this Court's orders and procedures.  Administrative Order (AO) No. 1997-11 addresses Supreme Court administrative public hearings. Under Section (B)(2) of AO 1997-11, "[u]nless immediate action is required, the adoption or amendment of rules or administrative orders that will significantly affect the administration of justice will be preceded by an administrative public hearing . . .." The "Gag Order" was adopted without first holding a public administrative hearing on December 6, 2006.

AO 1997-11(B)(2) further requires that "[i]f no public hearing has been held before a rule is adopted or amended, the matter will be placed on the agenda of the next public hearing, at which time the Supreme Court will hear public comment regarding whether the rule should be *retained or amended*." (Emphasis added.)  Therefore on January 17, 2007, the "Gag Order" was presented for public comment at a public administrative hearing.  The records of this Court show that after the January 17, 2007 public administrative hearing, the matter was "passed" to a later date and thus, no action was taken.  There was no vote by this Court to retain or amend the "Gag Order" and to this day, there has been no vote.  In fact, the court file was closed without a vote from the Court on February 27, 2007.  Despite the fact that there never was a vote to retain or amend the "Gag Order," it

3

I write further to clarify the circumstances of and disclose a conversation that took place between myself and Mr. Muth in October 2009 regarding *In re Servaas*. This Court's opinions in *In re Servaas* were published for the public on July 31, 2009. On August 24, 2009 the JTC filed a motion for rehearing or clarification in this Court. On September 11, 2009 this Court issued an order denying a motion for rehearing and containing an additional statement by Chief Justice Kelly, which clarified by amendment her original opinion. Therefore, this Court's file in *In re Servaas* closed on September 11, 2009.

In mid-September 2009, I briefly encountered my friend and former attorney, Mr. Muth, at the State Bar of Michigan Fellows Reception in Dearborn. Given that the file in *In re Servaas* had already been closed, Mr. Muth and I agreed to meet in Traverse City for a visit over lunch when he would be passing

---

was published in *Michigan Rules of Court—State*. Without any vote to retain or amend the "Gag Order," it has erroneously remained as an allegedly effective administrative order in our Court rules and on this Court's website.

I also advised the parties in the *Servaas* matter as follows:

> Although this Court has not established clear, thorough, open and
> fair rules for disqualification of justices, it is necessary to inform the
> Court and the parties of my association with attorney Jon Muth. I
> have no personal bias for or against Mr. Muth, or any of the parties,
> or other attorneys in this matter . . . .

I repeated my disclosure to the parties on March 26, 2008 when the case again came before this Court. The parties did not object to my participation in the *Servaas* matter. Mr. Fischer, representing the JTC, specifically waived any objection to my participation.

4

through town on October 1, 2009. At the time that we agreed to meet, and up until the time I received this Court's Commissioner Report in late March 2010, I did not remember that at the March 4, 2009 *In re Servaas* oral argument, Mr. Fischer stated that "Judge Servaas had his attorneys and a number of others file a grievance against me with the Attorney Grievance Commission." Mr. Fischer made this statement in response to questions about whether the JTC had authorized or encouraged him to proceed in the manner that he did while handling the *Servaas* matter and making an unannounced visit to confront Judge Servaas in his chambers.[6]

Because I did not remember Mr. Fischer's statement at oral argument, I did not realize that a file for a grievance against Mr. Fischer may have been opened and an investigation of his conduct may have been ongoing. Under MCR 9.126, such files are sealed.[7] Therefore, I had no official notice of any file's existence, and I had no notice of any file's status.

---

[6] The record in *In re Servaas* contains an audio recording of Mr. Fischer's unannounced visit to Judge Servaas's chambers on January 16, 2008 and his threat to "drag [Judge Servaas's] name through the mud" unless he agreed to resign by 9:00 a.m. the following morning. The recording was made, apparently without the knowledge of Mr. Fischer or Judge Servaas, by the State Police Trooper accompanying Mr. Fischer on the unannounced visit to Judge Servaas's chambers. The recording was also made public in the media, and is available online at http://blog.mlive.com/grpress/2008/04/_by_john_tunison_the.html (last accessed April 20, 2010).

[7] MCR 9.126—Open Hearings; Confidential Files and Records, provides in pertinent part:

5

Mr. Muth and I did meet on October 1, 2009 for lunch in Traverse City. He indicated that he found this Court's result in *In re Servaas* strange, convoluted, and surprisingly close after what he had witnessed during the oral argument. I responded that his observation was correct and that the vote was originally 6-1 in Judge Servaas's favor. I told him my speculation was that the emphasis and the direction of some justices' positions perhaps shifted with recognition that the State Court Administrator and his office may have had more involvement in the *Servaas* matter than merely referring such allegations to the JTC for investigation and process according to JTC rules.

I reminded Mr. Muth that in my concurrence in *In re Servaas*, I called for an investigation of the JTC and any others possibly involved, but that no such investigation had occurred.[8] Instead, this Court published six (6) separate opinions, resulting in the convoluted decision that prompted a motion for rehearing or clarification by the JTC, required an amendment for clarification to one justice's opinion, and led to Mr. Muth's questions. Mr. Muth and I did not

---

(A) Investigations. Except as provided in these rules, investigations by the administrator or the staff may not be made public. At the respondent's option, final disposition of a request for investigation not resulting in formal charges may be made public.

[8] In my concurring opinion in *In re Servaas*, I urged this Court to "open an administrative file to investigate how this matter unfolded, including the events and actions of the Judicial Tenure Commission (JTC) and/or others responsible leading up to the JTC's recommendation of this case to this Court." ___ Mich at ___ (Weaver, J., concurring). Justice Hathaway signed my concurring opinion.

discuss or mention any request for an AGC investigation of Mr. Fischer or the possibility of a complaint for superintending control, which is the underlying issue of the instant complaint. We did not discuss any possible allegations of attorney misconduct by Mr. Fischer, or the instant complaint, in any way.[9]

Although Mr. Muth was my attorney at one point in time, he was not my attorney at any time while *In re Servaas* was pending, nor when we met in October 2009. To clarify, Mr. Muth is not currently my attorney, and I have not discussed the instant complaint with him, nor have I had any communication with him since I learned a few weeks ago in late March 2010 that the instant complaint had been filed in this Court. The instant complaint, while related to the *Servaas* matter, is a separate and distinct case.

Before I agreed to have lunch with Mr. Muth, I should have remembered Mr. Fischer's statement at the *In re Servaas* oral argument that a grievance was filed against him by Judge Servaas's attorneys. Had I remembered, I would have

_____

[9] Of course, in October 2009 I could not have known of the instant complaint for superintending control because it did not exist given that the AGC had not yet dismissed the underlying request for investigation of Mr. Fischer's conduct. In fact, the AGC did not dismiss the plaintiffs' 2008 request until November 17, 2009, by a personal and confidential letter sent to plaintiffs and Mr. Fischer. The instant complaint for superintending control was not filed in this Court by Mr. Muth and the other plaintiffs until January 20, 2010. Because the AGC proceeding was kept secret from this Court until the filing of the instant complaint on January 20, 2010, I could not have been aware in October 2009, when I met with Mr. Muth, of the procedural steps leading up to the instant complaint in this Court. Nevertheless, in retrospect, I should not have met with Mr. Muth.

7

realized that any grievance filed against Mr. Fischer by Mr. Muth could be pending with the AGC, and I would not and should not have met with Mr. Muth. But I did not remember and we did meet. Therefore, I must recuse myself from participating in the instant complaint for superintending control because of the appearance of bias or impropriety[10] that my meeting with Mr. Muth may present.[11]

---

[10] The test for determining whether an appearance of impropriety exists as laid out in *Caperton v A T Massey Coal Co, Inc*, 556 US ___; 129 S Ct 2252, 2255; 173 L Ed 2d 1208 (2009), is "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." Because of my meeting with Mr. Muth, it might appear to a reasonable person that I would not be impartial if I were to participate in this complaint.

[11] This Court recently amended MCR 2.003 to include an appearance of impropriety standard as a ground for disqualification of judges. The newly amended rule set forth in MCR 2.003(C)(1)(b) states: "The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as annunciated in *Caperton v Massey*, or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct." (Citation omitted.)

My meeting with Mr. Muth took place before this Court amended MCR 2.003 to include an appearance of impropriety standard. The first opportunity for this Court to apply the newly amended MCR 2.003 was in *Pellegrino v Ampco Systems Parking*, Docket No. 137111, when the plaintiff in that case filed a motion for disqualification of Justice Markman based on campaign statements Justice Markman had made about the plaintiff's attorney nine years prior to this Court amending the rule to include the appearance of impropriety standard. When reviewing and deciding the disqualification motion filed against Justice Markman, I stated that I "will not apply the appearance-of-impropriety standard retroactively to statements made by a justice concerning a party or a party's attorney prior to the rule's amendment." *Id.* While I stated in *Pellegrino* that I will not apply the appearance of impropriety standard retroactively to other members of this Court, in this matter I will apply the standard retroactively to myself because since 2003 I have been calling for this Court to establish clear, written, and fair rules for

In light of the above information, I will only participate in this complaint if the parties, Brady *et al.* and the AGC, agree to waive my disqualification in accordance with MCR 2.003(E).[12]

---

disqualification and have been addressing the issue of my participation when necessary, as I did in *In re JK*, 468 Mich 202; 661 NW2d 216 (2003), *Gilbert v Daimler Chrysler*, 469 Mich 883; 669 NW2d 265 (2003), *Henry v Dow Chem Co*, ___ Mich ___; 772 NW2d 301 (2009), *In re Servaas*, ___ Mich ___; 774 NW2d 46 (2009), and *Kyser v Kasson Twp*, 483 Mich 903; 761 NW2d 692 (2009).

[12] MRC 2.003(E) provides:

Waiver of Disqualification. Parties to the proceeding may waive disqualification even where it appears that there may be grounds for disqualification of the judge. Such waiver may occur whether the grounds for disqualification were raised by a party or by the judge, so long as the judge is willing to participate. Any agreement to waive the disqualification must be made by all parties to the litigation and shall be in writing or placed on the record.

9

MEMORANDUM

TO:        Corbin Davis, Clerk of the Michigan Supreme Court
           cc:  Justices

FROM:      Justice Elizabeth A. Weaver

RE:        *In re Anonymous Judge*, #135650

DATE:      January 23, 2008

---

Upon receiving the respondent's brief in this matter this morning, January 23, 2008, it came to my attention that Judge Servaas is represented by attorney Jon R. Muth.  Pursuant to the Code of Judicial Conduct Canon 3(C):

> A judge should raise the issue of disqualification whenever the judge has cause to believe that grounds for disqualification may exist under MCR 2.003(B).

Attorney Jon Muth has represented me within the past year, for instance, as my attorney during the public hearing concerning the majority of four's adoption of the "Gag Order," Administrative Order No. 2006-08.

Although this Court has not established clear, thorough, open and fair rules for disqualification of justices, it is necessary to inform the Court and the parties of my association with attorney Jon Muth.  I have no personal bias for or against Mr. Muth, or any of the parties, or other attorneys in this matter; nor have I discussed this case with anyone and am therefore willing to serve in this matter. However, if any party or attorney requests by January 29, 2008 that I not serve, I will recuse myself.

At today's judicial conference, I informed the justices of the above and requested that Corbin Davis, Clerk of the Court, send this statement to the parties and attorneys as promptly as possible.

# MEMORANDUM

TO:       The Justices
          cc: Corbin Davis, Mike Schmedlen and Danilo Anselmo

FROM:     Justice Elizabeth A. Weaver

RE:       *In re Hon Steven R Servaas*, #135835 ▮▮▮
          No. 9 on CR Agenda for April 2, 2008

DATE:     March 26, 2008

_____

This Court recently considered another matter concerning the Honorable Steven R. Servaas before it: *In re Anonymous Judge*, Docket No. 135650. On January 23, 2008, I circulated a memorandum to the justices, and requested that the Clerk of the Court notify the parties, that an attorney representing Judge Servaas, Jon R. Muth, has represented me within the past year.

As attorney Jon Muth is also representing Judge Servaas in this matter, Docket No. 135835, by this memo, I again repeat my statement made in *In re Anonymous Judge*, # 135650, attached hereto. I further request that the Clerk of the Court notify the parties that I plan to participate in *In re Hon Steven R Servaas*, #135835, having heard no objection to my participation in the earlier matter, *In re Anonymous Judge*, # 135650.

1

Michigan Compiled Laws Annotated <u>Currentness</u>
   Administrative Orders of the Michigan Supreme Court
   → **ADMINISTRATIVE ORDER 2006-8. DELIBERATIVE PRIVILEGE AND CASE DISCUSSIONS IN THE SUPREME COURT**

The following administrative order, supplemental to the provisions of Administrative Order No. 1997-10, is effective immediately.

All correspondence, memoranda and discussions regarding cases or controversies are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical, improper or criminal conduct to the JTC or proper authority.

CREDIT(S)

Entered December 6, 2006, 477 Mich.

COMMENTS

Cavanagh, Weaver and Kelly, JJ., dissent.

Dissenting statements by Weaver and Kelly, JJ., to follow.

WEAVER, J. (dissenting). I dissent to the unscheduled and abrupt adoption of Administrative Order 2006-08 (AO 2006-08) by the majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN[1] because it unconstitutionally restricts a justice's ability to perform his duty to the public by barring a justice from "giv[ing] in writing" his "reasons for each decision" and "the reasons for his dissent."[2] By adopting AO 2006-08 and ordering the suppression of my dissent in *Grievance Administrator v Fieger*, #127547, the majority of four are attempting to hide their own unprofessional conduct and abuse of power which has resulted in their failure to conduct the judicial business of the people of Michigan in an orderly, professional, and fair manner.

The majority's adoption of AO 2006-08 during an unrelated court conference, without public notice or opportunity for public comment, illustrates the majority of four's increasing advancement of a policy of greater secrecy and less accountability-a policy that wrongly casts "a cloak of secrecy around the operations" of the Michigan Supreme Court.[3]

Simply put, AO 2006-08 is a "gag order," poorly disguised and characterized by the majority of four as a judicial deliberative privilege. The fact is, no Michigan case establishes a "judicial deliberative privilege," nor does any Michigan statute, court rule, or the Michigan Constitution.

AO 2006-08-the "gag order"- has been hastily created and adopted by the majority of four, without proper notice to the public, and without opportunity for public comment, despite such requirements directed by Administrative Order 1997-11. Administrative Order 1997-11(B)(2) states:

Unless immediate action is required, the adoption or amendment of rules or **administrative orders that will signifi-**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**cantly affect the administration of justice** will be preceded by an administrative public hearing under subsection (1). If no public hearing has been held before a rule is adopted or amended, the matter will be placed on the agenda of the next public hearing, at which time the Supreme Court will hear public comment on whether the rule should be retained or amended. (Emphasis added.)

The adoption of AO 2006-08 was not preceded by an administrative public hearing. Further, AO 2006-08 was not shown on the notice of public administrative hearing scheduled for January 17, 2007 agenda that was circulated and published on December 14, 2006. After learning that AO 2006-08 was not placed on the next public administrative hearing agenda as required by AO 1997-11, I informed by memo of the same date (December 14) the justices and relevant staff, that AO 1997-11(B)(2) requires that AO 2006-08 be included in the notice for the next public administrative hearing on January 17, 2007. That AO 2006-08 significantly affects the administration of justice is obvious given that the majority of four relied on it to order on December 6, 2006, the suppression of my dissent in *Grievance Administrator v Fieger*, #127547, motion to stay. As of today, December 19, 2006, AO 2006-08 has not been placed on the January 17, 2007 public hearing notice and agenda.[4]

The majority has not publicly articulated any reason why AO 2006-08 should be adopted, nor any reason why immediate action without prior notice to the public or a public hearing was necessary. Article 6, § 6 of the Michigan Constitution requires in writing reasons for decisions of the Court. However, AO 2006-08 can be employed by any majority to impermissibly and unconstitutionally restrict the content of a justice's dissent or concurrence. Thus any present or future majority can in essence censor and suppress a dissenting or concurring justice's opinions.

The public has a vested, constitutional interest in knowing the reasons for a dissenting or concurring justice's divergence from a majority opinion.[5] The majority of four's efforts to censor and suppress the opinions of other justices significantly affect the administration of justice and violate the Michigan Constitution Art 6 § 6. The "gag order," AO 2006-08, is unconstitutional and unenforceable. As employed by the majority in *Grievance Administrator v Fieger*, #127547, the current majority is using AO 2006-08 to censor and suppress my dissent. I cannot and will not allow it to interfere with the performance of my duties as prescribed by the Michigan Constitution and with the exercise of my rights of free expression as guaranteed by both the Michigan Constitution and the United States Constitution.

The majority of four has adopted this "gag order" (AO 2006-08) in order to suppress my dissent in *Grievance Administrator v Fieger*, motion for stay, #127547. Finding no "gag rule" in the Michigan Constitution, statutes, case law, court rules and canons of judicial ethics, the majority of four has decided instead to legislate its own "gag order." The majority of four's "gag order" evidences an intent to silence me now, and to silence any future justice who believes it is his duty to inform the public of serious mishandling of the people's business.[6]

The majority's "gag order" purportedly protects the justices' deliberations under a so-called "judicial deliberative privilege" based on unwritten traditions.

But the Michigan Constitution, statutes, case law, and court rules do not establish a judicial deliberative privilege.[7] In fact, the closest thing to a "judicial deliberative privilege" in Michigan is contained within the Canons of the Code of Judicial Conduct. It is this so-called "judicial deliberative privilege" that I have understood for my entire 32-year judicial career, and by which I strive to abide.

As to a judge's ability to speak regarding "a pending or impending proceeding in any court," Canon 3A(6) provides:

A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit a judge from making public statements in the course of official duties or from explaining for public information the procedures of the court or the judge's holdings or actions.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Attachment to Justice Weaver's statement
explaining her non-participation.]

Administrative Order 2006-8

Page 3

Canon 3A(6) thus recommends against a judge speaking on a case that is pending or impending in any court; however, Canon 3A(6) does not absolutely prohibit comment on such cases.[8]

As to a judge's "administrative responsibilities," Canon 3B does not even address, much less recommend or require, abstention from public comment. Canon 3 B(1) does state that

A judge should diligently discharge administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

One way to "facilitate the performance of the administrative responsibilities of other judges and court officials" is to inform the public when they need to know of a misuse or abuse of power, or know of repeated, unprofessional behavior seriously affecting the conduct of the people's business.

Certainly nothing in Canon 3 can be said to create any obligation of confidentiality or permanent secrecy like that adopted by the majority of four in AO 2006-08, and in the November 13, 2006, IOP. It should be noted that there have been instances both in the past and present, in which justices have made references in opinions to matters discussed at conference and in memorandum, and to actions before the Court.[9]

In determining when one must speak out, or abstain from speaking out, I am guided by the fact that, as a justice, I am accountable first and foremost to the public. The public expects to be informed by a justice if something is seriously wrong with the operations of the Supreme Court and the justice system. How else would the public know and be able to correct the problem through the democratic and constitutional processes? The public rightly expects the justices of this Court to act with courtesy, dignity, and professionalism toward one another. In matters of principle and legitimate public concern, however, the public does not expect a justice to "go along to get along." The public trusts, or should be able to trust, that the justices of this Court will not transform the Court into a "secret society" by making rules to protect themselves from public scrutiny and accountability.

Yet the public also expects that justices will exercise wise and temperate discretion when disclosing information regarding the operations of the Court and the justices' performance of their duties. The public does not expect, and likely would not tolerate, being informed every time a justice changes positions on a matter before the court, or every time a justice loses his temper with a colleague. The public expects justices to debate frankly, to be willing to change positions when persuaded by better argument, and to be willing to admit that they have changed their positions. Moreover, momentary, human imperfections do not affect the work of the Court. The public would lose patience with and not support a justice who recklessly and needlessly divulged such information for intemperate or political reasons. It is an elected or appointed justice's compact with the people that, whenever possible, a justice will make all reasonable efforts to correct problems on the Court from within.

But the public needs and expects to be informed by a justice when repeated abuses of power and/or repeated unprofessional conduct influence the decisions and affect the work of their Supreme Court and the justice system. I believe it is my duty and right to inform the public of such repeated abuses and/or misconduct if and when they occur.

I recognize that there is a federal judicial deliberative privilege of <u>uncertain scope</u> in federal common law, but that is not Michigan law and is not binding on this Court. Moreover, the deliberative privilege articulated in federal law does not prevent a justice from speaking out regarding matters of legitimate public concern. *Pickering v Board of Educ,* 391 US 563 (1968).

The federal deliberative privilege is narrowly construed and qualified and it does not apply to administrative actions. Furthermore, that privilege is not intended to protect justices, but rather operates to protect the public confidence in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Attachment to Justice Weaver's statement
explaining her non-participation.]

Administrative Order 2006-8

Page 4

the integrity of the judiciary.

For such public confidence to be warranted, the Michigan Supreme Court must be orderly and fair and must act with integrity, professionalism, and respect. In a pertinent case, the federal Fifth Circuit Court of Appeals addressed whether a judge could be reprimanded for publicly commenting upon the administration of justice as it related to a case in his court. *Scott v Flowers*, 910 F2d 201 (5th Cir 1990). The court cited *Pickering*, supra, in recognition that the deliberative privilege could not prevent the judge from truthfully speaking out regarding matters of legitimate public concern where the judge's First Amendment rights outweighed the government's interest in promoting the efficient performance of its function.

In light of *Pickering, supra,* the *Scott* court concluded:

Neither in its brief nor at oral argument was the Commission able to explain precisely how Scott's public criticisms would impede the goals of promoting an efficient and impartial judiciary, and we are unpersuaded that they would have such a detrimental effect. Instead, we believe that those interests are ill served by casting a cloak of secrecy around the operations of the courts, and that by bringing to light an alleged unfairness in the judicial system, *Scott* in fact furthered the very goals that the Commission wishes to promote. [*Scott, supra* at 213.]

The *Scott* court thus held that the judge could not constitutionally be reprimanded for making public statements critical of the court.

The federal deliberative privilege as defined in the federal common law does not extend to every utterance and action within the Court's conferences and communications. It does not protect actions taken on non-adjudicative matters involving administrative responsibilities. It also does not extend to actions or decisions of the Court, because the actions and decisions of the Court are not deliberations, they are <u>facts</u> that occur at the end of a deliberative period.

Further, any judicial deliberative privilege does not extend to repeated resort to personal slurs, name calling, and abuses of power, such as threats to exclude a justice from conference discussions, to ban a justice from the Hall of Justice, or to hold a dissenting justice in contempt. Nor does any judicial privilege extend to conduct such as refusing to meet with justices on the work of the Court as the majority of four have now twice done on November 13 and November 29, 2006. The privilege certainly does not extend to illegal, unethical, and improper conduct. Abuses of power and grossly unprofessional conduct are entirely unrelated to the substantive, frank, and vigorous debate and discussion of pending or impending adjudicated cases that a properly exercised judicial privilege should foster.

An absolute judicial deliberative privilege that the majority of four of this Court has wrongly created in AO 2006-08 does not exist in the Michigan Constitution, statutes, case law, court rules, or Code of Judicial Conduct, and should not be allowed to prohibit the publication of any justice's dissent or concurrence.

Perhaps further attempts to define the scope of the so-called "judicial deliberative privilege" in Michigan may be warranted. However, the privilege cannot effectively be expanded beyond that expressed within the Code of Judicial Conduct through the abrupt, unconstitutional adoption of Administrative Order 2006-08, "gag order."

Most importantly, any judicial deliberative privilege defined in any rule or order must not infringe on a justice's constitutional duties and rights. Const 1963, art 6, § 6 requires that

Decisions of the Supreme Court, including all decisions on prerogative writs, **shall be in writing** and shall contain a concise statement of the facts and **reasons for each decision** and reasons for each denial of leave to appeal. **When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.** (Emphasis added.)

Any new court rule or administrative order on deliberations that would force a dissenting or concurring justice to not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

include in his dissent or concurrence any or all of his reasons would interfere with the justice's duty under art 6, § 6. In effect, such a rule would allow the majority justices to re-write the dissent or concurrence, silence their opposition, and would be unconstitutional. AO 2006-08 is such an unconstitutional rule.

If the majority wanted to attempt to further define the so-called "judicial deliberative privilege" in Michigan, it should have done so by opening an administrative file on the issue and by inviting public comment before making a rash decision to adopt a "gag order" without public notice or comment and before implementing the "gag order" by ordering the suppression of a fellow justice's dissent. After all, any judicial deliberative privilege must serve the public's interest in maintaining an efficient and impartial judiciary, not the justices' personal interests in concealing conduct that negatively and seriously affects the integrity and operations of the Court. The public must, therefore, have a voice in defining the boundaries of any expanded so-called "judicial deliberative privilege" that the majority of this Court desires to legislate. I have already expressed in dissents on administrative matters (which the majority has refused to release) that the majority of four has repeatedly abused its authority in the disposition of and closure of ADM 2003-26, the Disqualification of Justices file. They have mischaracterized final actions as straw votes and failed to correct, approve and publish minutes, and my dissents thereto, for conferences on the Disqualification of Justices file, ADM 2003-26, dating back almost ten (10) months to March 1, 2006.

Regrettably, under the guise of promoting frank discussion, the majority of four has tried to erect an impermeable shield around their abusive conduct-itself the cause of the breakdown of frank, respectful and collegial discussion on this Court. No law or rule exists to support this idea, anywhere. The majority of four have precipitously and abruptly adopted AO 2006-08 without notice to fellow justices or the public, and without opportunity for public comment.

Over the past year and longer, the majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN, have advanced a policy toward greater secrecy and less accountability. I strongly believe that it is past time to end this trend and to let sunlight into the Michigan Supreme Court. An efficient and impartial judiciary is "ill served by casting a cloak of secrecy around the operations of the courts." *Scott, supra.*

FOOTNOTES

1. On December 6, 2006, moved by Chief Justice TAYLOR, and seconded by Justices CORRIGAN and YOUNG, the majority of four adopted AO 2006-08. Justices CAVANAGH, WEAVER, and KELLY dissented. As adopted the order states:

The following administrative order, supplemental to the provisions of Administrative Order 1997-10, is effective immediately.

All correspondence, memoranda and discussions regarding cases or controversies are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical, improper or criminal conduct to the JTC or proper authority.

CAVANAGH, WEAVER and KELLY, JJ., dissent.

Dissenting statements by Weaver and Kelly, J J., to follow.

2. Const 1963, art 6, § 6 requires that:

Decisions of the Supreme Court, including all decisions on prerogative writs, **shall be in writing** and shall contain a concise statement of the facts and **reasons for each decision** and reasons for each denial of leave to appeal. **When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.** (Emphasis added.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

3. *Scott v Flowers, 910 F2d 201, 213 (5th Cir 1990)*.

4. Note that AO 2006-08 must be placed on the public hearing notice for January 17, 2007, by December 20, 2006, to conform to the 28 day notice requirement of AO 1997-11.

5. By requiring that justices give reasons for their decisions in writing, Michigan Constitution Art 6 § 6 gives the people of Michigan an opportunity to improve justice by providing a window to learn how their Supreme Court is conducting Michigan's judicial business. Furthermore, requiring written decisions from justices provides information and guidance for case preparation to future litigants, who may have similar issues to decided cases.

6. On November 13, 2006, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN voted to adopt an Internal Operating Procedure (IOP) of the Court, substantively identical to the "gag order" adopted by AO 2006-08. Justices CAVANAGH and KELLY abstained. I voted against the IOP/secret "gag rule." The majority of four adopted the IOP/secret "gag rule" in an unannounced executive session from which court staff were excluded. As adopted on November 13, the IOP/secret "gag rule" states:

All memoranda and conference discussions regarding cases or controversies on the CR and opinion agendas are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical or criminal conduct to the Judicial Tenure Commission or proper law enforcement authority.

IOPs are unenforceable guidelines adopted by majority vote, without public notice or comment, and can be changed at any time, without public notice or comment, by a majority vote. (See Supreme Court internal operating procedures at http://courts.michigan.gov/supremecourt/ (accessed on December 19, 2006), which provides in a disclaimer that the IOPs are unenforceable and only require a majority vote to be adopted.) The adoption of this IOP was never reported in the Supreme Court minutes. It appears that the majority found that the hastily adopted IOP "gag rule" would not be a proper vehicle to suppress my dissents because my dissents could not be suppressed by color of an unenforceable court guideline.

Thus, on November 29, 2006 the majority moved and seconded the adoption of an "emergency" Michigan Court Rule, another "gag rule," to suppress my dissents and concurrences. The majority discussed but tabled the new proposed emergency court rule that was substantively identical to AO 2006-08 "gag order" that was adopted on December 6, 2006.

Finally, on December 6, 2006, during an unrelated court conference, without public notice or opportunity for public comment, the majority adopted AO 2006-08, the "gag order." There was no notice given to the justices that an administrative order was to be considered, nor was the matter ever on an administrative agenda of this Court. Nonetheless, AO 2006-08 was adopted by a 4-3 vote by Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN. Shortly thereafter, it was moved, seconded, and adopted by a 4-3 vote, by Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN to suppress my dissent in *Grievance Administrator v Fieger*, #127547, motion to stay. Justices CAVANAGH, WEAVER and KELLY dissented. Chief Justice TAYLOR then ordered the clerk of court, who was present, not to publish my dissent in Fieger.

7. In the order, AO 2006-08 states that AO 2006-08 is "supplemental to the provisions of Administrative Order 1997-10." I note that Administrative Order 1997-10 (AO 1997-10) does not prohibit a justice of the Supreme Court from disclosing information.

By its plain language, AO 1997-10 is inapplicable. It addresses *public* access to judicial branch administrative information. The order lists types of information that this Court can exempt from disclosure *when faced with a request*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Attachment to Justice Weaver's statement
explaining her non-participation.]

Page 7

Administrative Order 2006-8

*from the public* for that information. Administrative Order 1997-10 is not relevant to and does not prohibit a justice of this Court from disclosing information, even information that might be considered deliberative, when disclosure involves matters of legitimate public concern.

8. To abstain is "[t]o refrain from something by one's own choice." Webster's New World Dictionary, 2nd College Edition (1982).

9. For example, most recently, in Justice CAVANAGH'S concurring statement in *In re Haley*, 476 Mich 180, 201 n 1 (2006), he stated:

This Court is currently engaged in a discussion about the proper procedure for judicial disqualifications, as well as the ethical standards implicated in such a procedure. Further, this Court will soon be asking for public comment and input to further this discussion in a more open manner.

In addition, in his dissent in *Grievance Administrator v Fieger*, 476 Mich 231, 327 n 17 (2006), Justice CAVANAGH stated:

Further, while I do not join in the fray between the majority and my colleague Justice WEAVER, I take this opportunity to note that three alternate proposals, two of which have been crafted by this majority, regarding how this Court should handle disqualification motions have been languishing in this Court's conference room for a substantial period of time. In the same way I will look forward to the dust settling from the case at bar, I will similarly anticipate this Court's timely attention to the important matter of disqualification motions. I take my colleagues at their word that the issue of disqualification will be handled in a prompt manner in the coming months.

Note that Justice CAVANAGH'S statements, published in his concurrence in *Haley* and his dissent in *Fieger*, were not objected to by any justice, including the majority of four.

In addition to these more recent references to matters discussed at judicial conferences, see in *In re Mathers*, 371 Mich 516 (1963).

Order Adding Administrative Order No. 2006-8 to the Public Hearing Scheduled on January 17, 2007, [order entered December 20, 2006]

On order of the Court, Administrative Order 2006-8 has been added to the public hearing scheduled for January 17, 2007. Such order, having been enacted by the Court as an emergency measure on December 6, 2006 for purposes of preserving the integrity and confidentiality of the Court's deliberative process and to reflect practices that have characterized the Michigan Supreme Court, and to the best of our knowledge every other appellate court within the United States, including the United States Supreme Court, since their inception, the Court is particularly interested in witnesses addressing the following question: Where a Justice violates or threatens to violate **Administrative Order 2006-8**, what means of enforcement and/or sanction, if any, are properly adopted by the Court?

WEAVER, J. *(concurring and dissenting)*. I concur only with placing on the January 17, 2007 public administrative hearing the adoption of Administrative Order No. 2006-8 (AO 2006-8), adopted by a 4-3 vote on December 6, 2006, by Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN. I dissent from the remaining language in the order.

As stated in my dissent to AO 2006-8 (filed yesterday, December 19, 2006), AO 2006-8 must be placed on the January 17, 2007, public administrative hearing because it significantly affects the administration of justice as it can be used to order the censorship and/or suppression of any justice's dissents or concurrences, as the majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN, did on December 6, 2006, by order-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing the Clerk of the Court to suppress my December 5, 2006, dissent from *Grievance Administrator v Fieger*, Docket No. 127547 (motion for stay).

Censoring and/or suppressing a justice's written opinion is contrary to article 6, § 6 of the Michigan Constitution and the right to free expression as guaranteed by both the Michigan Constitution and the United States Constitution. Further, censoring and/or suppressing a justice's written opinion interferes with a justice's duty to inform the public of abuse of power and/or serious mishandling of the people's judicial business.

The issue that should be of most interest and given most attention at the January 17, 2007, public administrative hearing is the constitutionality of AO 2006-8.

KELLY, J. (*concurring in part and dissenting in part*). A bare majority of the justices adopted Administrative Order No. 2006-8 on an emergency basis without stating what emergency existed. That same majority now requests public comment on what sanctions are appropriate for violation of the order. AO 2006-8 contains no sanctions, and the hearing order lists none that might be appropriate. I can recall no other instance in which the Court has sought public comment without revealing such information.

The language that the majority does present to the public is a rule that it purports to be necessary to preserve the integrity and confidentiality of the Court's deliberative process. What interests me most is the community's view on whether this rule is necessary or even legal. I request comment on whether the rule unnecessarily or even unconstitutionally restricts the right of justices to speak out on matters crucial to the functioning of the judiciary. I am interested in hearing what good reasons exist to: (1) prevent release of information once a case has been finally decided, (2) prevent release of information about administrative matters, and (3) limit justices to disclosing certain information to only the Judicial Tenure Commission or a "proper authority," rather than to the public at large. I believe that full and frank discussion on this important new rule will be had only when these questions are addressed.

CAVANAGH, J., concurs with KELLY, J.

Administrative Order 2006-8, MI R ADMIN Order 2006-8

Current with amendments received through December 1, 2009.

Copr. (c) 2010 Thomson Reuters.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



200 OTTAWA AVENUE, N.W., SUITE 1000
GRAND RAPIDS, MI 49503-2427
TELEPHONE: (616) 458-1300
FACSIMILE: (616) 458-6753
http://www.dickinsonwright.com

DENNIS C. KOLENDA
DKolenda@dickinsonwright.com
(616) 336-1034

April 30, 2010

**Via First Class Mail**

Corbin R. Davis, Clerk
Michigan Supreme Court
P.O. Box 30052
Lansing, MI 48909

Re:   Brady, et al v Attorney Grievance Commission
       Supreme Court Docket No. 140409

Dear Mr. Davis:

Once again, I have been delegated by the petitioners in the above-referenced case, of which I am one, to communicate on their behalf with the Justices of the Supreme Court. Specifically, I have been asked to request that you inform the Justices that petitioners do not object to Justice Weaver continuing to participate in the case. We do not read her memorandum of April 20, 2010, as a request that we and the Attorney Grievance Commission waive her disqualification. We read that memorandum as simply informing all involved that she has decided to refuse herself unless the parties decide to waive her disqualification or refusal, which we do, although we do not believe that there is any impropriety or appearance of impropriety calling for her to step aside.

After considering all of the information provided to us, including the information provided by Justices Corrigan, Young and Markland, and the letter sent to the Justices by Mr. Muth, we are of the opinion that there is no basis, including even the appearance of impropriety, for Justice Weaver to disqualify herself. While our request for investigation of Mr. Fischer relates to his conduct in handling what became *In re Servaas*, the propriety or impropriety of that conduct is a completely independent issue. Therefore, the conversation between Justice Weaver and Mr. Muth regarding that case is unrelated to the above-referenced case. There is, therefore, no basis for any objection to Justice Weaver's continued participation. Hence, our decision.

Very truly yours,

Dennis C. Kolenda

DCK/cms
cc: Robert L. Agacinski
GRAPIDS 99998-1365 247855v2

RECEIVED
MAY 03 2010
CORBIN R. DAVIS
CLERK SUPREME COURT

**[Attachment to Justice Weaver's statement
explaining her non-participation.]**



MILLER
JOHNSON
Attorneys and Counselors

Calder Plaza Building
250 Monroe Avenue NW
Suite 800
P.O. Box 306
Grand Rapids, MI 49501-0306

MERITAS LAW FIRMS WORLDWIDE

**JON R. MUTH**
Attorney at Law

616.831.1736
616.988.1736 fax
MuthJ@millerjohnson.com

April 30, 2010

Justices of the Supreme Court
c/o Mr. Corbin R. Davis, Clerk of the Court
Michigan Hall of Justice
925 W. Ottawa Street
P.O. Box 30052
Lansing, Michigan

Re: Justice Weaver's Request to Remit Disqualification, *Brady, et al. v AGC*,
Docket No. 140409

Dear Mr. Davis:

Please see the attached letter addressed to the Michigan Supreme Court, which I
would appreciate you disseminating to the Justices. By separate communication from Dennis C.
Kolenda the petitioners in this case will respond to the Request to Remit Disqualification.

Thank you for your assistance.

Very truly yours,

MILLER JOHNSON

By Jon R. Muth

JRM:kll
Enclosure



MILLER JOHNSON
Attorneys and Counselors

Calder Plaza Building
250 Monroe Avenue NW
Suite 800
P.O. Box 306
Grand Rapids, MI 49501-0306

JON R. MUTH
Attorney at Law

616.831.1736
616.988.1736 fax
MuthJ@millerjohnson.com

MERITAS LAW FIRMS WORLDWIDE

April 30, 2010

Justices of the Supreme Court
c/o Mr. Corbin R. Davis, Clerk of the Court
Michigan Hall of Justice
925 W. Ottawa Street
P.O. Box 30052
Lansing, Michigan

Re: Justice Weaver's Request to Remit Disqualification, *Brady, et al. v AGC,*
Docket No. 140409

Dear Justices of the Supreme Court:

This letter responds to the letter of Justices Corrigan, Young and Markman dated April 28, 2010. It states the facts of my communication with Justice Weaver and establishes categorically that there was no violation of any of the Canons or Rules of Professional Conduct cited in that letter. I believe that these facts also clearly establish that there is no basis of Justice Weaver to consider disqualification, even under an appearance of impropriety standard. The rule has never been and cannot be that a conversation between a judge and a lawyer can have the effect of disqualifying the judge from participation in a case in which the lawyer has some involvement, when the subject matter of the case was never discussed and when the matter was not even in litigation when the conversation took place.

I have known and been friendly with Justice Elizabeth Weaver since our service together on the Michigan Trial Court Assessment Commission during 1997-98 . Since that time we have spoken or met socially on several occasions. As might be expected after a career of almost 39 years in the law, I am also friendly with and have had occasional social contact with other judges.

During the period from July 27, 2006 and March 30, 2007 (the dates of Miller Johnson's first and last time entries) I was retained by Justice Weaver to provide legal services. At no time after March 30, 2007 have I had an attorney-client relationship with Justice Weaver.

The Judicial Tenure Commission proceedings against Judge Servaas commenced on or about January 17, 2008. Judge Servaas was represented in that matter by Miller Johnson. The primary lawyer was my partner, James S. Brady.

While I was involved in the representation of Judge Servaas from the onset, my role was negligible until the hearing before the Judicial Tenure Commission. I presented the oral argument for Judge Servaas there on July 14, 2008 and in the Supreme Court on March 4, 2009.

MILLER JOHNSON

Justices of the Supreme Court
c/o Mr. Corbin R. Davis, Clerk of the Court
April 30, 2010
Page 2

---

At the first occasion that the Supreme Court was presented with a motion from the Judicial Tenure Commission in *In re Servaas*, on January 23, 2008, and again on March 28, 2008, when a second motion was presented, Justice Weaver gave accurate formal notice to the parties and to the Court of her prior professional relationship with me. Miller Johnson discussed this disclosure with our client for purposes of determining how to respond. Neither party objected to Justice Weaver's participation in *In re Servaas* and the Judicial Tenure Commission affirmatively waived any objection.

*In re Servaas* was argued before the Supreme Court on March 4, 2009 and decided on July 31, 2009. Petitioner's Motion for Clarification or Rehearing was filed by the Judicial Tenure Commission on August 24, 2009. It was resolved by the Court's order of September 11, 2009, which closed the case.

Prior to the final decision of *In re Servaas*, I never spoke to or had any communication with Justice Weaver about that case or any related issue. The only communication I or anyone at Miller Johnson had with her, any member of the Supreme Court or the Court regarding that case prior to the final decision was through the filing of formal correspondence, pleadings and briefs.

Never from the time In re Servaas reached the Supreme Court on the Report and Recommendation of the Judicial Tenure Commission until its final decision did I speak to or communicate with Justice Weaver on <u>any</u> subject.

I saw Justice Weaver at the Fellows Reception at the State Bar meeting in Dearborn on September 16, 2009. We conversed for several minutes, mostly in the company of others. Since we had not met or spoken for many months and since I was planning to travel through Traverse City on October 1, 2009 on my return from a mediation in the Upper Peninsula, we made arrangements to meet for lunch.

I met Justice Weaver at her office shortly after noon on October 1 and we traveled to a downtown Traverse City restaurant for lunch. During our time together we discussed an array of subjects, ranging from Michigan State basketball and its Final Four prospects to current politics. During the conversation Justice Weaver told me something of the *Servaas* decision-making process. Justice Weaver's Disclosure Statement of April 20, 2010 accurately summarizes the content of the conversation. At the time of this conversation, *In re Servaas* had been finally and definitely resolved. There was no matter pending or impending anywhere as to which this could be considered an *ex parte* communication.

Shortly after my meeting with Justice Weaver I told Judge Servaas of the conversation as it related to his case.

MILLER JOHNSON

Justices of the Supreme Court
c/o Mr. Corbin R. Davis, Clerk of the Court
April 30, 2010
Page 3

_____

The grievance against Mr. Fischer was filed on July 2, 2008. I was one of seventeen lawyers who signed the complaint. I was also the primary draftsman and it was transmitted to the Attorney Grievance Commission over my signature.

As of October 1, 2009 no action had been taken by the Attorney Grievance Commission with respect to the grievance and I had no knowledge of when it might be processed or what action might be taken. I had not at that date seen any answer to the grievance from the Respondent. Lacking any communication from the Grievance Administrator regarding the complaint, other than the fact that the matter was to be investigated following the resolution of *In re Servaas*, I knew that there was nothing then pending before any court or tribunal. I had no information that suggested that the matter would ever come to the attention of the Supreme Court. On November 17, 2009 the Attorney Grievance Commission dismissed the complaint against Mr. Fischer. On January 20, 2010 the instant Complaint for Superintending Control was filed in the Supreme Court.

During my conversation with Justice Weaver on October 1, 2009 there was no discussion of any aspect of the Fischer grievance. Nor was there any discussion regarding Mr. Fischer or his actions that led to the grievance or his role in the *Servaas* case. I have never at any time had any discussion or communication with Justice Weaver or any other member of the Court about anything pertaining to Mr. Fischer. At the oral argument of *In re Servaas* and in the briefing that preceded it, we made a conscious effort to say nothing of the grievance. We deemed it a separate and unrelated matter, the mention of which only had the potential to distract from already complex issues and to cast the Judicial Tenure Commission, for which Mr. Fischer advocated, in an unfair and compromised position. The only reason it came to the attention of the Court at the oral argument was on account of the statement made by Mr. Fischer.

From my knowledge of *In re Servaas* and my knowledge of the alleged facts in the Fischer grievance, the result in the *Servaas* case, much less how it was reached, has no relevance to any aspect of the Fischer grievance or the issue now presented to the Supreme Court on the Complaint for Superintending Control.

Very truly yours,

MILLER JOHNSON

By _____
Jon R. Muth

JRM:kll
cc:    Attorney Grievance Commission
        Complainants on Fischer grievance

PRESS RELEASE MAY 13, 2010 FROM JUSTICE ELIZABETH A. WEAVER
RE: MICHIGAN SUPREME COURT JUSTICE ELECTION POLITICS

Yesterday, May 12, 2010 three of my colleagues (Justices Corrigan, Young and Markman) revealed to the public that they sent a letter regarding me to the Judicial Tenure Commission. Any accusations by my colleagues that I have violated ethical rules are incorrect. I have done nothing wrong.

Nothing particularly surprises me anymore in the politics of Supreme Court Justice Elections. My colleagues have gone to great lengths to create a controversy. They are politically attacking me in an attempt to bully me into not running for re-election because they want this Court to be a "secret club." Such political maneuvering is unworthy of my colleagues. I was not elected by the people to be part of a "secret club." I have a constitutional right to not have my dissents suppressed and a duty to the people of this State to keep them informed about how this Court conducts its judicial business.

Justice Young has publicly stated that he objects to my serving on this Court, and I have no reason to believe that Justices Corrigan and Markman disagree. While three of my colleagues may not want me on this Court, many people throughout the State are urging me to run again this November 2010 and continue as a Justice of the Supreme Court of Michigan. I have not yet made a decision about whether to run for re-election. However, when I do make my decision it will be based on the best interest of the people, and not as a result of political bullying.

This type of Supreme Court Justice politics is another reason why we need to reform how Michigan Justices are elected and appointed. Justices should be independent, orderly, professional, fair, accountable, and truly restrained in the use of the Supreme Court's power. Justices should possess and apply common sense. Most importantly, Justices should insist upon transparency, not secrecy, when conducting the people's judicial business in an independent, non-partisan manner, regardless of any special interest groups or a Justice's personal agendas.

For information about my reform proposals, please see my personally funded website, www.justiceweaver.com. In addition, the segment from this Court's May 12 Public Administrative Conference pertinent to the unconstitutional "gag order" will soon be available on my website.

A copy of this Press Release will be available at www.justiceweaver.com.



# MILLER
# JOHNSON
### Attorneys and Counselors

Calder Plaza Building
250 Monroe Avenue NW
Suite 800
P.O. Box 306
Grand Rapids, MI 49501-0306

**JON R. MUTH**
Attorney at Law

616.831.1736
616.988.1736 fax
MuthJ@millerjohnson.com

**MERITAS LAW FIRMS WORLDWIDE**

June 8, 2010

Corbin R. Davis, Clerk of the Court
Michigan Supreme Court
Michigan Hall of Justice
P.O. Box 30052
Lansing, MI 48909

Re:     Brady, et al. v AGC
        Supreme Court Docket No.140409

Dear Mr. Davis:

Please communicate this responsive correspondence to the Justices regarding the above-captioned matter.

I have received the letter of June 1, 2010 from the Attorney Grievance Commission. Mr. McGlynn is correct that I received a copy of Mr. Fischer's answer on August 20, 2009 and that I filed a response on behalf of the complainants on September 11, 2009. That portion of my earlier letter wherein I state "I had not at that date seen any answer to the grievance from the Respondent" is inaccurate. I trusted my memory and not my file and for that inaccuracy I apologize.

That error, however, does not in any way impact the salient issues in the current debate. Mr. Fischer's answer to the complaint was lacking in any revelatory information that was not already known and was so non-responsive that it caused the complainants' to make note of his failure to adhere to the applicable rules in their response of September 1. The grievance was, as I indicated, under investigation on October 1 and the AGC had given me no indication of the likely outcome. Regardless of the state of my knowledge of the grievance process, it was not a subject I discussed with Justice Weaver.

Since this letter addresses errors in communication, I would be remiss if I did not bring to the Court's attention certain inaccurate information that has been reported in the press and attributed to members of the Court. I will give but three examples.



RECEIVED

JUN 9 2010

CORBIN R. DAVIS
CLERK SUPREME COURT

MILLER JOHNSON

Corbin R. Davis, Clerk of the Court
June 8, 2010
Page 2

---

1.    An article by Barton Deiters in the Grand Rapids Press on May 14 reports: "Weaver gave 'tactical and strategic' information to Muth, who also served as Weaver's attorney in separate matters."

First, I obtained no tactical and strategic information and certainly none that would impact my role as one of seventeen complainants in the Fischer grievance. Second, the article suggests, but does not explicitly say, that at the time of the meeting I was serving as counsel to Justice Weaver. As you know from my prior communication, any attorney-client relationship had ended many months before.

2.    An article in the Lansing State Journal on May 16 reports, allegedly quoting one Justice: "Justice Weaver appears to have broken this court's ... rule that a judge should not secretly help one side in a lawsuit."

First, the Servaas case was fully resolved at the time of the conversation, so no assistance was possible. Second, no "help" was provided for any other lawsuit (or even the Fischer grievance if that can be considered one.)

3.    A report by Interlochen Public Radio on May 13 stated: "[T]he grievance is that Weaver revealed details of one of the Justices' closed-door sessions to a lawyer who used the information to craft a motion in an attorney discipline case before the Supreme Court." Specific quotes were attributed to certain Justices that support the impression that I was provided "strategic" information.

First, nothing in my conversation with Justice Weaver was of any possible use in making tactical or strategic decisions regarding the Fischer grievance. It has been clear from the outset that the resolution of the grievance is in no way conditioned upon or related to the result in the Servaas case. How or why individual justices voted in the Servaas case may speak to their views regarding the conduct of Judge Servaas, not that of Mr. Fischer. Second, I did not craft the Complaint for Superintending Control. Dennis Kolenda is its author. Third, nothing in the Complaint for Superintending Control requires tactical or strategic consideration of the attitudes of specific justices toward Judge Servaas or Mr. Fischer. It is addressed solely to the process of the Attorney Grievance Commission. Finally, to seek insight into the attitude of the justices toward Mr. Fischer, one need only go to the Court's web site and review the oral argument tape on the Servaas appeal. To the extent that any insight regarding the Fischer grievance might be

MILLER JOHNSON

Corbin R. Davis, Clerk of the Court
June 8, 2010
Page 3

---

derived from utterances by members of the Court, they will we found there and in the written opinions in the Servaas case.

Hopefully, future public utterances by those who have knowledge of the details of the conversation Justice Weaver had with me will accurately reflect what was actually said – and not said. The Court may wish to consider simply releasing the actual content of the conversation so that the media will not be led to speculate and the public will be able to better judge the propriety of all involved.

Very truly yours,

MILLER JOHNSON

By _____
Jon R. Muth

JRM:kll
cc:     Attorney Grievance Commission